302 So.2d 649 (1974)
Philip O. THEVENET et al., Plaintiffs-Appellants,
v.
W. O. CLAUSE, et al., Defendants-Appellees.
No. 4673.
Court of Appeal of Louisiana, Third Circuit.
October 24, 1974.
Rehearing Denied November 20, 1974.
*650 Willis & Hardy, Paul J. Hardy, St. Martinville, for plaintiffs-appellants.
Champagne & Colomb by George J. Champagne, Jr., Lafayette, for defendants-appellees.
Before CULPEPPER, MILLER and WATSON, JJ.
MILLER, Judge.
Plaintiffs Philip O. Thevenet and James Thevenet appeal the judgment rejecting their possessory action against defendants W. O. Clause and Thomas J. Periou. The trial court held that plaintiffs failed to prove the requisite possession as owner. We affirm.
Defendants claim the 30 by 4,886 foot tract in dispute is part of a larger tract owned by them. The strip is located in Breaux Bridge and was used as a road in the year 1900. The road led to a tract (hereinafter called the "east tract") then owned by Ursin Broussard, plaintiff's ancestor in title. Ursin's son testified that his father acquired the 30 foot strip from the St. Martin Parish Police Jury in about 1900 to provide access from the east tract to the public road, now Louisiana Highway 328. There is no showing that the Police Jury acquired or conveyed title to the disputed tract, other than this testimony.
In 1907 Ursin conveyed the east tract to a son, and in that instrument conveyed to the named vendee and to two other parties, the use of the 30 foot strip for the purpose of passage to the public road.
In 1908 Ursin's son conveyed a portion of the east tract to plaintiffs' father Andre Thevenet, and referred to the strip in the following manner:
It is expressly understoodthat together with said (east tract) landall rights of ways, passage and drainage-belonging to said landis hereby transferred & sold to the present buyer. (Parenthetical note added.) *651 Plaintiffs' father died in 1943 and the judgment of possession placed his children in possession of the strip in this way:
Together with all the rights of way, passage and drainage referred to as belonging to said property in that Act of Conveyance recorded under ....
In 1954 plaintiffs purchased from their brothers and sisters all their interests in the east tract, and the 30 foot strip was "conveyed" in this way:
Together with all the rights of way, passage and drainage referred to as belonging to said property in that Act of Conveyance recorded under Entry No. 33812 of the Conveyance Records of St. Martin Parish, Louisiana, and more particularly, an undivided one-half interest in and to that certain road, being 30 feet wide by a depth of 4,886 feet and extending from the property herein conveyed in a Southwesterly direction to the Public Paved Road (L.D.H. # 328) in Breaux Bridge, Louisiana.
The description also refers to a plat by Fred Colomb, a licensed surveyor, and concludes by stating this is the same property acquired by the heirs from their parents' succession.
We find the acts of possession exercised by plaintiffs and their ancestors in title to be consistent with their recorded title to a servitude of passage.
The evidence established that the 30 foot strip was fenced about the year 1900. Gates were installed at the east and west ends. The strip was used by the Broussard family and others for access from the east tract to what is now Highway 328. When Andre Thevenet acquired the east tract in 1908, his family and others continued to use the 30 foot strip as a passageway. Another road provided access to the east tract in about 1920, but the strip continued to be known as "Andre Thevenet's Lane", and about 1925 was used as a race track for horses. In 1938, the strip was used by the Thevenets to haul sugarcane from the east tract to the mill. One plaintiff testified that his father used the strip as a pasture, and that they repaired the fences from time to time.
Several persons familiar with the strip testified the Thevenets claimed it as owners. But every one of these witnesses admitted under cross-examination that all they knew about the tract was that Thevenet Lane was an old road which they assumed the Thevenet's owned. Their testimony was consistent with the Thevenet's having a right of passage. These witnesses admitted that they were not concerned with ownership claims until the year 1970 when plaintiffs contacted them to appear as witnesses.
Chester Degeyter, Sr. farmed the land presently owned by defendants. He testified that he obtained permission from the Thevenets to cut hay on the strip for the year 1949. The consideration given by Degeyter for this permit was his obligation to keep the strip clean. This is in keeping with the needs of the servitude of passage owned by the Thevenets.
In 1954, the strip was surveyed by Fred Colomb at the request of one plaintiff. The only stakes found were those marking the northeast and northwest corners, the admitted north boundary of property belonging to others to the north. Colomb had been employed to survey the east tract in preparation for a proposed partition between the Thevenet heirs. Colomb testified that although there was no title shown to him to indicate that the strip was owned by the Thevenets, he was specifically requested by one of the Thevenet heirs to survey the strip and show it on his plat. He noted this fact in his field notes. It is relevant to note that the partition based on this survey described the strip as a right of way. Colomb's inclusion of the strip on his plat of survey does not establish that the Thevenets possessed as owners.
During the year 1956 the Soil Conservation Service secured Philip Thevenet's *652 permission to construct a ditch along the north side of the disputed tract. Permission was obtained to place the spoil bank on the strip. This usage is consistent with the maintenance of the strip as a passageway. Soil Conservation's witness admitted that no check was made to determine record ownership.
It was also established that plaintiffs granted oil, gas, and mineral leases on the strip during the 1956-1968 period. Defendant's ancestors in title granted similar leases affecting the same tract. Execution of mineral leases does not establish the requisite civil possession under LSA-C.C.P. art. 3660 unless lessor or his ancestors in title had some corporeal possession. Ree Corporation v. Shaffer, 261 La. 502, 260 So.2d 307 (1972).
Plaintiffs claim that their possession of the strip was disturbed by the 1970 recordation of defendant Clause's deed to defendant Periou of a one-half interest in a tract which included the strip. That instrument conveyed property bounded on the north by property owned by the parties who owned the property to plaintiffs' north. If that constituted disturbance, then plaintiffs possession was also disturbed by recordation of the 1970 deed to plaintiff Clause (Tr. 175), the recordation of the 1970 judgment of possession in the Succession of Alexis F. Broussard (Tr. 173), and the recordation of seven other deeds during the years 1917 through 1921 (Tr. 156-170).
Another earlier disturbance was established. One plaintiff admitted at Tr. 364 that an attorney advised him that a thorough search of the records revealed that the Thevenets did not have record title.
Plaintiffs have failed to establish manifest error in the trial court's conclusion that plaintiffs failed to prove possession of the strip "in the manner and for the period required by law...." The cited authorities are applicable. LSA-C.C.P. art. 3658; Hill v. Richey et al., 221 La. 402, 59 So.2d 434 (1952); Kilchrist v. Conrad, 191 So.2d 705 (La.App. 3 Cir. 1966); Moise et al. v. LeBlanc, 280 So.2d 618 (La.App. 3 Cir. 1973).
The trial court judgment is affirmed at appellants' costs.
Affirmed.
CULPEPPER, J., dissents and assigns written reasons.
CULPEPPER, Judge (dissenting).
The substantial issue is whether plaintiffs or their ancestors in title intended to possess only a servitude of passage, or whether they intended to possess the strip of land as owners. The majority opinion holds that plaintiffs and their ancestors in title intended to possess only a servitude of passage. It is my view that the evidence shows both plaintiffs and their ancestors in title intended to possess this strip of land as owners.
In concluding that plaintiffs and their ancestors in title intended to possess only a servitude of passage, the majority opinion relies almost entirely on the evidence of plaintiffs' title. These various conveyances in plaintiffs' chain of title refer to the strip of land in question as a "right of way", or a "passage", or a "road". But the acts of corporeal possession exercised both by plaintiffs and their ancestors in title show an intent to possess as owners of the land. I base my opinion on the following evidence.
After another public road provided access to the east tract in about 1920, the strip continued to be known as "Andre Thevenet's Lane". As the majority opinion states, it was in about 1925 that it was used for several years as a race track for horses. This was a use for a purpose other than passage, and shows an intent to possess the land as owner.
The last use of the strip as a passageway was in about 1938 when the Thevenets *653 used it to haul sugarcane to the mill. After about 1940 the strip was no longer used as a passageway and portions of it grew up in bushes and small trees. Thus, any use of the strip after 1940 was as owner of the land.
Several persons familiar with the strip of land testified that the Thevenets continued to claim it as owners after its use as a passageway ceased. No one used it without the Thevenets' permission. Of particular significance is the testimony of Chester Degeyter, Sr., who farmed the adjacent land presently owned by defendants. Degeyter testified that he knew the Thevenets claimed to own the strip and he first asked their permission to cut hay on it in about 1949. He said that in order to mow the strip he had to remove some old pieces of wire which lay along the southern boundary, which were the remnants of the old fence which separated the 30-foot strip from the Broussard land, now owned by defendants. With the permission of the Thevenets, Degeyter cut hay from 1949 through 1953. The consideration given by Degeyter for cutting hay was his agreement to keep the strip clean for use as a hay pasture or for grazing. Clearly, these cuttings of hay by Degeyter over a period of four years constituted acts of corporeal possession by Degeyter as either lessee or agent of the Thevenets. This was something more than the use of the strip as a servitude of passage. These were acts of corporeal possession which showed an intent on the part of the Thevenets, through their agent or lessee, Degeyter, to possess the land as owners.
Another impressive act of corporeal possession by the Thevenets was their employment of Fred Colomb to survey the strip in 1954 for purposes of a proposed partition among the Thevenet heirs. Colomb testified that when he went on the land to make his survey in 1954 he found that portions of the strip were grown up in thick bushes and trees, particularly on the west end. He said he had to hack his way with a knife to survey the lines. This indicates clearly that there had been no use of the strip of land as a passage for several years prior to 1954. Nevertheless, plaintiffs had continued to exercise corporeal possession over the property and to claim it as owners.
Another act of corporeal possession by the Thevenets was in 1956 when the Soil Conservation Service secured Philip Thevenet's permission to construct a ditch along the north side of the disputed strip and to place a spoil bank on the strip. This was not use of the strip as a passageway. This was an act of corporeal possession of the property permitted by the Thevenets who claimed to own the land.
Of course, the oil, gas and mineral leases executed by the Thevenets during the period 1956-1968 shows an intent to possess this strip of land as owners. If they had merely intended to possess a servitude of passage, they would of course have owned no interest in the oil, gas and minerals.
The applicable law is as follows: LSA-C.C.P. Article 3658 provides in part:
"To maintain the possessory action the possessor must allege and prove that: (1) He had possession of the immovable property or real right at the time the disturbance occurred; (2) He and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud; ..."
LSA-C.C.P. Article 3660 provides in part:
"A person is in possession of immovable property or of a real right, within the intendment of the articles of this chapter, when he has the corporeal possession thereof, or civil possession thereof preceded by corporeal possession by him or his ancestors in title, and possesses for himself, whether in good or bad faith, or even as a usurper."
Comment (b) under LSA-C.C.P. Article 3660 explains that the term "corporeal possession" *654 is taken from Civil Code Article 3436 and the jurisprudence thereunder. Civil Code Article 3436 states that the requisites of possession are (1) the intention of possessing as owner and (2) the corporeal possession of the thing. In Kilchrist v. Conrad, 191 So.2d 705 (La.App. 3rd Cir. 1966) we stated that the corporeal possession required for the possessory action is the same as that required for the acquisitive prescription of 30 years, citing several cases. Additionally, we stated in Kilchrist that the jurisprudence generally holds corporeal possession to be that which is actual, physical, open, public, unequivocal, continuous, uninterrupted and showing an intent to possess as owner. The area corporeally possessed must be evidenced by some type of visible boundaries such as fences, etc. The possession must be evidence by visible activities or signs sufficient to give notice to the public as to the character and extent of the possession. In Kilchrist, we also stated the rule that the corporeal possession must be of a type for which the particular land is destined or suitable.
LSA-C.C. Article 3432 provides the method by which servitudes are possessed. That article reads:
"The possession of incorporeal rights, such as servitudes and other rights of that nature, is only a quasi possession, and is exercised by the species of possession of which these rights are susceptible."
Under LSA-C.C. Articles 3442 and 3444, when a person acquires corporeal possession, the intent to possess is presumed to continue, even if he ceases corporeal possession, unless a clear intent to terminate possession is shown. The last clause of Article 3444 states: "the possessor is supposed always to retain his first intention, unless a third person has usurped or taken from him the possession, or he has failed to exercise an actual possession for ten years."
Jurisprudence holds that the clause "or he has failed to exercise an actual possession for ten years", which is the last clause in Article 3444, has no application to cases of civil possession preceded by corporeal possession under color of title, Miller v. Albert Hanson Lumber Company, 134 La. 225, 63 So. 883; Manson Realty Company v. Plaisance, 196 So.2d 555 (La.App. 4th Cir. 1967). Furthermore, jurisprudence holds that where a person has civil possession, preceded by corporeal possession, as in the present case, such possession is not usurped by the mere civil or constructive possession of a third party, it being necessary that the third party show usurpation by corporeal possession, Souther v. Domingue, 238 So.2d 264 (3rd Cir. 1970); Crain v. Graves, 177 So.2d 189 (La.App. 3rd Cir. 1965); Ernest Realty Company v. Hunter Company, 189 La. 379, 179 So. 460 (1938); Smith v. Arkansas Fuel Oil Company, 219 La. 982, 54 So.2d 421 (1951).
Under these authorities it is clear that plaintiffs had civil possession, which was preceded by corporeal possession by them or their ancestors in title. This possession continued until the date of the disturbance in 1970, unless the defendants can show that they usurped the possession of the plaintiffs or their ancestors in title by adverse corporeal possession.
There is no evidence that defendants or their ancestors in title had corporeal possession of the 30-foot strip at any time prior to the disturbance. They never used it as a passage, or farmed it or otherwise corporeally possessed it as owners in any way.
Defendants argue that their ancestors in title usurped the possession of plaintiffs by granting a mineral lease on the 30-foot strip in 1966. The case of Ree Corporation v. Shaffer, 261 La. 502, 260 So.2d 307 (1972) is specific authority that the execution of mineral leases, or trapping leases, are not sufficient to establish the requisite civil possession under C.C.P. Article 3660, *655 unless the lessor or his ancestors in title had some corporeal possession. The case is clear authority for the rule that the mere execution of a mineral lease does not constitute an act of corporeal possession sufficient to interrupt the civil possession of another which was preceded by corporeal possession.
Defendants also argue that they and their ancestors in title usurped the possession of the plaintiffs by cultivating and otherwise corporeally possessing portions of the land included within their title, which possession, under Civil Code Article 3437, defendants contend constituted possession of the entire estate included within their title. The evidence is not clear whether the 30-foot strip of land is included within the title of the defendants. However, even assuming that it is, the jurisprudence is clear that possession of the whole of an estate by possession of part, under Civil Code Article 3437, is mere constructive possession and is not sufficient to usurp civil possession preceded by corporeal possession of another party, Crain v. Graves, 177 So.2d 189 (La.App. 3rd Cir. 1965) and the authorities cited therein.
In conclusion, it is my view that the sole issue in this case is whether plaintiffs or their ancestors in title intended to possess the mere incorporeal right of a servitude of passage, or whether they intended to possess this strip of land as owners. There is no question that plaintiffs and their ancestors in title corporeally possessed the land, i. e., they fenced it, used it as a passageway for years, then used it as a race track and as a hay pasture, all of which were clearly sufficient to give notice to the public that they were exercising corporeal possession. The only question is their intent.
The majority concludes from descriptions in plaintiffs' chain of title, which refer to the strip of land as a "passage", or a "right of way", or a "road", that the plaintiffs and their ancestors in title intended only to possess a servitude. I think that to determine their intent we must look beyond this language in the conveyances and see what acts of possession were actually exercised by plaintiffs and their ancestors in title. We don't know whether plaintiffs and their ancestors in title knew the legal definition of a servitude or knew that the deeds referred to the strip of land as a "passage", etc., but we do know from the evidence that they claimed to own this strip of land. Everyone in the community knew that the Thevenets claimed it. It was called "Thevenets Lane". Of particular significance is the fact that after about the year 1940 when the use of the strip of land as a passageway ceased and was no longer possible because bushes and trees grew up in it, the plaintiffs continued to exercise corporeal possession and to use it for purposes other than a passage. I think the plaintiffs have shown that they and their ancestors in title corporeally possessed with the intent to possess as owners, and that this possession continued without interruption or usurpation, until the disturbance in 1970.
For the reasons assigned, I respectfully dissent.